J-S46001-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: S.B. A/K/A S.A.A.B., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| APPEAL OF: S.W., MOTHER | : | |
| | : | No. 3664 EDA 2018 |

Appeal from the Order Entered November 15, 2018
In the Court of Common Pleas of Philadelphia County Family Court at
No(s):  CP-51-AP-0000683-2018,
CP-51-DP-0002530-2016, FID: 51-FN-002433-2016

| | | |
|---|---|---|
| IN THE INTEREST OF: A.W. A/K/A A.I.W., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| APPEAL OF: S.W., MOTHER | : | |
| | : | No. 3666 EDA 2018 |

Appeal from the Order Entered November 15, 2018
In the Court of Common Pleas of Philadelphia County Family Court at
No(s):  CP-51-AP-0000682-2018,
CP-51-DP-0002529-2016, FID: 51-FN-002433-2016

J-S46001-19

IN THE INTEREST OF: S.C. A/K/A : IN THE SUPERIOR COURT OF
S.A.C., A MINOR : PENNSYLVANIA
:
:
:
APPEAL OF: S.W., MOTHER :
:
:
:
:
:
: No. 3667 EDA 2018

Appeal from the Order Entered November 15, 2018
In the Court of Common Pleas of Philadelphia County Family Court at
No(s):  CP-51-AP-0000383-2018,
CP-51-DP-0002528-2016, FID: 51-FN-002433-2016


IN THE INTEREST OF: S.W. A/K/A : IN THE SUPERIOR COURT OF
S.M.W., A MINOR : PENNSYLVANIA
:
:
:
APPEAL OF: S.W., MOTHER :
:
:
:
:
:
: No. 3668 EDA 2018

Appeal from the Order Entered November 15, 2018
In the Court of Common Pleas of Philadelphia County Family Court at
No(s):  CP-51-AP-0000382-2018,
CP-51-DP-0002527-2016, FID: 51-FN-002433-2016


BEFORE:   PANELLA, P.J., OLSON, J., and COLINS, J.*

MEMORANDUM BY PANELLA, P.J.:                  **FILED OCTOBER 22, 2019**

S.W. ("Mother") appeals from the decrees entered November 15, 2018,

that granted the petitions of the Philadelphia Department of Human Services

---

* Retired Senior Judge assigned to the Superior Court.

- 2 -

("DHS"), and involuntarily terminated her parental rights to her sons, S.M.W. (born January 2006), S.A.C. (born January 2009), A.I.W. (born June 2012), and S.A.A.B. (born May 2013) (collectively, "Children").[1] Mother also appeals the orders entered the same day that changed Children's permanent placement goals to adoption. After careful review, we affirm.

The trial court set forth the factual and procedural history of this matter as follows:

> On November 15, 2016, the [c]hildren became known to the Department of Human Services ("DHS") when DHS received a General Protective Services ("GPS") report alleging that there was no food in the parental home; that the home was heated with electric space heaters; that the home had no hot water; and that Mother and Children were residing in a shelter. The report also alleged that Father was currently hospitalized recovering from a bullet wound and that there was [a] history of domestic violence between Mother and Father. On November 15, 2016, DHS visited the home and found [c]hildren A[.]W[.] and S[.]B[.] with Mother. DHS observed that the home was infested with bed bugs; the stove [was] greasy; and the basement smelled of raw sewage. Child A[.]W[.] and [c]hild S[.]B[.] lacked proper dental care and had a foul o[dor]. As a result of the home visit, DHS obtained an Order for Protective Custody ("OPC") for the [c]hildren. On November 30, 2016, following a hearing, the [c]hildren were adjudicated dependent.

> On March 9, 2017, a Single Case Plan ("SCP") was created. The parental objectives for Mother were to receive mental health treatment and enroll in job counseling. The parental objectives of Father were to enroll in parenting classes and mental health treatment. On February 18, 2018, a revised SCP was created. The

---

[1] The court also involuntarily terminated the parental rights of T.B. ("Father"), the father of A.I.W. and S.A.A.B. Father appealed the decrees terminating his parental rights, and we address his appeal in a separate memorandum. The fathers of S.M.W. and S.A.C. consented to the termination of their parental rights and have not participated in this appeal.

parental objectives for Mother were to visit the [c]hildren bi-weekly separate from Father; (2) Mother was to attend anger management classes; (3) Mother was to attend mental health treatment; (4) Mother would make the house suitable for the [c]hildren; and (5) Mother would seek employment and appropriate housing. . . .

Trial Court Opinion, 5/8/19, at 2-4 (citations to the record omitted).

On August 21, 2018, DHS filed petitions to involuntarily terminate the parental rights of Mother and Father and to change Children's permanent placement goals to adoption. The court conducted hearings on the petitions on September 14, 2018 and November 15, 2018.[2]

DHS presented the testimony of Jasmine Mitchell, the Community Umbrella Agency ("CUA") case manager for Turning Points for Children; Majita Mohammad, a life skills and visitation coach; and Sakina Shaddiq, a visitation coach. Father testified on his own behalf. On November 15, 2018, the court entered decrees involuntarily terminating Mother's parental rights to Children, and orders changing Children's permanent placement goals to adoption. On December 14, 2018, Mother timely filed notices of appeal and concise statements of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b).[3]  This Court, acting *sua sponte*, consolidated Mother's appeals.

_____

[2] Children were represented by Attorney James Martin as legal counsel and Attorney Daniel Kurland as guardian *ad litem*.

[3] The record suggests that Mother filed four notices of appeal, one for each child, with the notices then being photocopied and filed in the termination and dependency dockets for each child. In doing so, Mother failed to comply with

On appeal, Mother raises the following issues for our review:

1. Did the [t]rial [c]ourt commit reversible error, when it deprived [M]other of her due process rights and other Pennsylvania and Federal constitutional rights by refusing to either continue or delay the combined termination and goal change hearing to allow [M]other to be present to testify and/or by refusing to allow [M]other to testify when she arrived at the court prior to a final order being issued?

2. Did the [t]rial [c]ourt commit reversible error, when it involuntarily terminated Mother's parental rights where such determination was not supported by clear and convincing evidence under the adoption act, 23 P[a].C.S.A. § 2511(a)(1), (2), (5), [and] (8)?

3. Did the [t]rial [c]ourt commit reversible error, when it involuntarily terminated Mother's parental rights without giving primary consideration to the effect that [. . .] the termination would have on the developmental, physical and emotional needs of the child[ren] as required by the adoption act, 23 P[a].C.S.A. § 2511(b)?

---

the Official Note to Pa.R.A.P. 341, which provides, in relevant part, "Where . . . one or more orders resolves issues arising on more than one docket or relating to more than one judgment, separate notices of appeal must be filed." Pa.R.A.P. 341, Official Note. In **Commonwealth v. Walker**, 185 A.3d 969, 977 (Pa. 2018), our Supreme Court held that the failure to file separate notices of appeal from an order resolving issues on more than one docket "requires the appellate court to quash the appeal." Following **Walker**, **supra**, recognizing that "decisional law may have been unclear to this point," a panel of this Court declined to quash an appeal from an involuntary termination decree based on noncompliance with Rule 341. **In re M.P.**, 204 A.3d 976, 981 (Pa. Super. 2019). However, in **M.P.**, the panel announced that this Court would quash any noncompliant appeals filed after the date of that opinion, that is, February 22, 2019. **See M.P.**, 204 A.3d at 986. Because Mother filed her notices of appeal on December 14, 2018, we decline to quash her appeal.

4. Did the [t]rial [c]ourt commit reversible error, when it terminated Mother's parental rights and changed the child[ren]'s goal[s] to adoption as substantial, sufficient, and credible evidence was presented at the time of trial which would have substantiated denying the Petition for Goal Change?

Mother's brief at 4.[4]

We review these claims mindful of our well-settled standard of review:

The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Initially, Mother contends that the trial court deprived her of her due process rights when it refused to either continue or delay the combined termination and goal change hearing to allow Mother to testify despite Father's assertion that Mother was in transit. **See** Mother's brief at 18-19. Further,

---

[4] We have re-ordered Mother's issues for ease of disposition.

Mother asserts that the trial court refused to allow Mother to testify when she arrived at court at the end of the hearing on November 15, 2018. ***See id.***[5]

With respect to a trial court's decision whether to continue a hearing, our Supreme Court has stated:

> Appellate review of a trial court's continuance decision is deferential. The grant or denial of a motion for a continuance is within the sound discretion of the trial court and will be reversed only upon a showing of an abuse of discretion. As we have consistently stated, an abuse of discretion is not merely an error of judgment. Rather, discretion is abused when the law is overridden or misapplied, or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias, or ill-will, as shown by the evidence or the record. . . .

***Commonwealth v. Brooks***, 104 A.3d 466, 469 (Pa. 2014) (citations and internal quotation marks omitted).

---

[5] Mother also contends that she did not receive appropriate notice of the November 15, 2018 hearing. ***See*** Mother's brief at 18-19. However, Mother did not assert a lack of notice in her Rule 1925(b) statement. Instead, Mother asserted: "The [t]rial [c]ourt committed reversible error, when it deprived [M]other of her due process rights and other Pennsylvania and Federal constitutional rights by refusing to either continue or delay the combined termination and goal change hearing to allow [M]other to be present and testify and/or by refusing to allow [M]other to testify when she arrived at the court prior to a final order being issued." Rule 1925(b) Statement, 12/14/18, at 2. Because Mother failed to include an assertion regarding a purported lack of notice, we conclude that she waived this issue. ***See Krebs v. United Refining Company of Pennsylvania***, 893 A.2d 776, 797 (Pa. Super. 2006) (holding that an appellant waives issues that are not raised in both his or her concise statement of errors complained of on appeal and the statement of questions involved in his or her brief on appeal). Moreover, we observe that both Father and the CUA caseworker testified that Mother was aware of the date and time of the November 15, 2018 hearing, and, in fact, Mother appeared at the hearing, albeit late. ***See*** N.T., 11/15/18, at 16, 22, 24, 34.

Here, Mother appeared for the first day of the termination hearing on September 14, 2018, but did not testify. When Mother was not present at the start of the hearing on November 15, 2018, which was listed for 11:30 a.m. but did not begin until 12:30 p.m., her counsel suggested that the court "proceed on [F]ather's case and then hold off for [M]other's case to give her some time to get her[e] if she really is on her way." *See* N.T., 11/15/18, at 3-4. When Father concluded his testimony and Mother had still not arrived, Mother's counsel requested a continuance. *See id.* at 25.

The trial court denied counsel's request to continue the hearing, noting, "[i]t's 12:54. This case has been bifurcated[,] [Mother]'s had every opportunity to get her[e]. She's not here. She wasn't available for the worker this morning and I'm not giving her anymore courtesies." *See id.* Given the wide discretion given to a trial court to grant or deny a continuance, we do not discern an abuse of discretion in the trial court's decision to deny Mother's request for a continuance.

We next address Mother's argument that the trial court erred in precluding her from testifying when she appeared in the courtroom following the court's pronouncement that it would terminate Mother's parental rights. At the conclusion of the November 15, 2018 hearing, the following discussion took place:

> [Counsel for Mother]:  Your Honor, just for the record, [M]other has arrived at this moment.

The Court: Yes, she's arrived after the hearing, and after argument. She's been in the courtroom for approximately a minute. It's now 1:05 p.m. and the [c]ourt's order stands.

[Counsel for Children]: Yes, [Y]our Honor. Your Honor, I ask to be vacated.

[Counsel for Father]: Your Honor, please note [F]ather's objection for the record.

(Multiple voices, incoherent.)

The Court: Sheriff, if you escort the parents out.

The Sheriff: Yes, [Y]our Honor.

N.T., 11/15/18, at 34.

Although Mother contends that the court precluded her from testifying, the transcript of the hearing shows that, following Mother's arrival, Mother's counsel did not attempt to have Mother testify.

In order to preserve an issue for appellate review, a party must make a timely and specific objection at the appropriate stage of the proceedings before the trial court. Failure to timely object to a basic and fundamental error will result in waiver of that issue. On appeal the Superior Court will not consider a claim which was not called to the trial court's attention at a time when any error committed could have been corrected. In this jurisdiction . . . one must object to errors, improprieties or irregularities at the earliest possible stage of the adjudicatory process to afford the jurist hearing the case the first occasion to remedy the wrong and possibly avoid an unnecessary appeal to complain of the matter.

*Thompson v. Thompson*, 963 A.2d 474, 475–476 (Pa. Super. 2008) (citation omitted).

Because counsel did not attempt to call Mother as a witness once she arrived, we reject Mother's argument that the trial court precluded Mother

- 9 -

from testifying. The failure to attempt to call Mother as a witness results in the waiver of this claim. Accordingly, we conclude that Mother's first issue fails.

We next address Mother's arguments relating to the involuntary termination of her parental rights. Termination of parental rights is governed by Section 2511 of the Adoption Act, 23 Pa.C.S.A. § 2101-2938, which requires a bifurcated analysis:

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

In this case, the trial court terminated Mother's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), and (8), as well as (b). This Court may affirm the trial court's decision regarding the termination of parental rights with regard to any one subsection of Section 2511(a), as well as Section 2511(b). *See In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). Here, we will focus our analysis on Section 2511(a)(2) and (b), which provides as follows:

**§ 2511. Grounds for involuntary termination**

**(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

\* \* \*

  (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

\* \* \*

**(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(2) and (b).

Our Supreme Court set forth our inquiry under Section 2511(a)(2) as

follows:

  As stated above, § 2511(a)(2) provides statutory grounds for termination of parental rights where it is demonstrated by clear and convincing evidence that "[t]he repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent." . . .

  This Court has addressed incapacity sufficient for termination under § 2511(a)(2):

- 11 -

> A decision to terminate parental rights, never to be made lightly or without a sense of compassion for the parent, can seldom be more difficult than when termination is based upon parental incapacity. The legislature, however, in enacting the 1970 Adoption Act, concluded that a parent who is incapable of performing parental duties is just as parentally unfit as one who refuses to perform the duties.

*In re Adoption of S.P.*, 47 A.3d 817, 827 (Pa. 2012) (citations omitted).

To satisfy the requirements of Section 2511(a)(2), the moving party must produce clear and convincing evidence regarding the following elements: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied. *See In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa. Super. 2003). The grounds for termination of parental rights under Section 2511(a)(2) are not limited to affirmative misconduct; to the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties. *See In re A.L.D.* 797 A.2d 326, 337 (Pa. Super. 2002).

This Court has long recognized that a parent is required to make diligent efforts towards the reasonably prompt assumption of full parental responsibilities. *See id.* A parent's vow to cooperate, after a long period of uncooperativeness regarding the necessity or availability of services, may properly be rejected as untimely or disingenuous. *See id.* at 340.

Mother asserts the trial court erred in terminating her parental rights pursuant to Section 2511(a)(2) because Mother worked to meet her SCP goals. *See* Mother's brief at 12-13. Mother contends that she remedied any deficiency in her housing, obtained employment, and consistently visited with Children. *See id.* Accordingly, Mother argues it was improper for the court to involuntarily terminate her parental rights. *See id.*

The trial court terminated Mother's parental rights pursuant to Section 2511(a)(2), reasoning that Mother failed to timely obtain appropriate housing, complete mental health treatment, parenting classes, or anger management. *See* Trial Court Opinion, 5/8/19, at 5-7. Further, the court credited testimony that Mother demonstrated impulse control problems and was hostile to caseworkers during her visitation, including an incident shortly before the termination hearing when Mother was escorted from the visit by security. *See id.* at 5. Moreover, Mother was inconsistent with her visits and did not appropriately interact with Children during the visits she did attend. *See id.* The trial court also noted that Mother failed to obtain a parenting capacity evaluation. *See id.* at 8. Accordingly, the court determined that DHS met its burden of proof with respect to Section 2511(a)(2).

The record supports the trial court's conclusion. Jasmine Mitchell, the CUA caseworker, testified that the family initially came to DHS's attention due to allegations involving the family home having a broken water heater, a lack of food and supervision, and poor hygiene. *See* N.T., 9/14/18, at 18. Children

were adjudicated dependent November 30, 2016, and have been in placement since that time. *See id.* Mother's SCP objectives were to complete a mental health evaluation; attend a parenting program; maintain contact with CUA; and attend the Achieving Reunification Center ("ARC") for parenting, employment, and education programs. *See id.* at 20.

Mitchell testified that Mother began mental health treatment with Warren E. Smith for a short time before transferring to the Wedge for treatment. *See id.* at 21. Mother began treatment in April 2017 and stopped in October 2017. *See id.* at 22. However, her treatment was inconsistent. *See id.*

The Wedge attempted to reengage Mother in January 2018 but Mother did not initially respond. *See id.* at 22-23. After Mother reengaged in treatment, Mitchell described Mother's attendance as inconsistent. *See id.* Mother attended therapy eleven times from April 2017 to September 2018, despite being scheduled once per week. *See id.* at 91. Mother was not attending mental health therapy at the time of the termination hearing. *See id.* at 22.

Further, Mother did not participate in the ARC programs, failing to even attend the intake. *See id.* at 28. Mother did not attend the parenting program and only obtained suitable housing shortly before the termination hearing. *See id.* at 23. Mother was ordered to attend anger management and was minimally compliant. *See id.* at 29. Additionally, Mother did not obtain

employment throughout the life of the case. *See id.* After Mother was assigned a life skills coach, Mother was non-compliant with the life skills coach and was eventually discharged. *See id.* at 28-29, 81-84.

Mother did not visit Children from November 2016 until February 2017 because she could not be contacted. *See id.* at 23-24. After February 2017, Mitchell described Mother's visits as inconsistent, noting Mother had the "bare minimum compliance with visitation." *Id.* at 24-25. During the visit Mitchell observed, Mother watched Children play on their electronic devices, did not speak to them about school, and did not bring food. *See id.* at 25-26. Mitchell noted that visits were always supervised because of Mother's lack of impulse control and anger. *See id.* at 26. Mother was ordered to obtain a parenting capacity evaluation, but did not appear for the appointment. *See id.* at 28.

Majita Mohammad testified regarding Mother's visits with Children, noting that from August 2017 through February 2018, Mother was offered approximately twenty-five visits and attended four. *See id.* at 102-03. After February 2018, Mother's attendance became more consistent. *See id.* at 108. At visits, Mother primarily watched Children play on their phones. *See id.* at 105.

Sakina Shaddiq testified regarding a visit that occurred shortly before the termination hearing, recalling that Mother arrived late for the visit and then left to get food for Children. *See id.* at 125. Mother came back with 10 minutes left and, when the foster parent did not want to bring the food in the

car, Mother became irate and security needed to escort her out of the building. *See id.* at 125-26. Mother reentered the building and continued yelling in front of Children before being removed again. *See id.*

As this Court has stated, "a child's life cannot be held in abeyance while a parent attempts to attain the maturity necessary to assume parenting responsibilities. The court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future." *In re Adoption of R.J.S.*, 901 A.2d 502, 513 (Pa. Super. 2006). The record substantiates the conclusion that Mother's repeated and continued incapacity, abuse, neglect, or refusal has caused Children to be without essential parental control or subsistence necessary for their physical and mental well-being. *See In re Adoption of M.E.P.*, 825 A.2d at 1272. Moreover, Mother cannot or will not remedy this situation. As noted above, in order to affirm a termination of parental rights, we need only agree with the trial court as to any one subsection of Section 2511(a) before assessing the determination under Section 2511(b), and we, therefore, need not address any further subsections of Section 2511(a). *In re B.L.W.*, 843 A.2d at 384.

We next consider whether the trial court abused its discretion by terminating Mother's parental rights pursuant to Section 2511(b).

> Section 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. As this Court has explained, Section 2511(b) does not explicitly require a bonding analysis and the term 'bond' is not defined in the Adoption Act. Case law, however, provides that analysis of the emotional bond, if any,

between parent and child is a factor to be considered as part of our analysis. While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.

> [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, this Court stated that the trial court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

*In re Adoption of C.D.R.*, 111 A.3d 1212, 1219 (Pa. Super. 2015) (quotation marks and citations omitted).

Mother argues that the trial court erred in its analysis of Section 2511(b) because Mother and Children share a beneficial bond, and breaking the bond is not in the best interests of Children. *See* Mother's brief at 16. Further, Mother asserts that her regular visits and progress towards reunification establish that there are no safety issues for Children. *See id.*

The trial court found that termination of Mother's parental rights was in the best interests of Children pursuant to Section 2511(b). *See* Trial Court Opinion, 5/8/19, at 4. The court emphasized Children's need for stability and continuity. *See* N.T., 11/15/18, at 33-34.

The record supports the trial court's conclusion. Mohammad testified that, during visits, Children hug and kiss Mother but do not say they miss her. *See* N.T., 9/14/18, at 104-05. Mohammad observed a bond between Mother

and S.A.A.B. and noted that Children were affectionate and called Mother "mom." *See id.* at 116. Children seemed excited to see Mother, but Children do not cry when she leaves and do not suggest they want to leave with Mother. *See id.* at 121-22. Moreover, counsel for Children indicated that S.A.A.B. and A.I.W. are happy living with their paternal grandmother, and did not indicate they wanted to return to Mother. *See* N.T., 11/15/18, at 27. The two older children, S.M.W. and S.A.C., indicated they love Mother, but understand they cannot return to her care. *See id.* at 28. S.M.W. and S.A.C. want to live with their aunt. *See id.*

The record confirms that it would best serve the needs and welfare of Children to involuntarily terminate Mother's parental rights pursuant to Section 2511(b). Preserving Mother's parental rights would serve only to deny Children the permanence and stability to which they are entitled. *See In re Adoption of C.D.R.*, 111 A.3d at 1220 ("Clearly, it would not be in [the child's] best interest for his life to remain on hold indefinitely in hopes that Mother will one day be able to act as his parent."). Accordingly, the trial court did not err in terminating Mother's parental rights to Children pursuant to Section 2511(b).

In her final issue, Mother argues the trial court erred in changing Children's permanent placement goals to adoption. The Juvenile Act governs proceedings to change a child's permanent placement goal. *See* 42 Pa.C.S.A. §§ 6301-6375. Trial courts must apply the following analysis:

Pursuant to [42 Pa.C.S.A.] § 6351(f) of the Juvenile Act, when considering a petition for a goal change for a dependent child, the juvenile court is to consider, *inter alia:* (1) the continuing necessity for and appropriateness of the placement; (2) the extent of compliance with the family service plan; (3) the extent of progress made towards alleviating the circumstances which necessitated the original placement; (4) the appropriateness and feasibility of the current placement goal for the children; (5) a likely date by which the goal for the child might be achieved; (6) the child's safety; and (7) whether the child has been in placement for at least fifteen of the last twenty-two months. The best interests of the child, and not the interests of the parent, must guide the trial court. As this Court has held, a child's life simply cannot be put on hold in the hope that the parent will summon the ability to handle the responsibilities of parenting.

*In re A.B.*, 19 A.3d 1084, 1088-89 (Pa. Super. 2011) (citations and quotation marks omitted). We review the court's ruling to ensure it is supported by evidence of record and to determine if it constitutes an abuse of the court's discretion. *See In re R.J.T.*, 9 A.3d 1179, 1190 (Pa. 2010).

Mother argues that the court erred in changing Children's permanency goals to adoption, asserting that the revised permanency goals were not in Children's best interests. *See* Mother's brief at 17. In support, Mother claims that she shares a beneficial bond with Children and made substantial progress towards reunification. *See id.*

Although the trial court did not specifically address this issue in its opinion, our review of the record supports the trial court's orders changing Children's permanent placement goals to adoption. At the time of the proceedings, Children had been in foster care for nearly two years. Mother failed to demonstrate an ability to parent Children during their time in care.

Accordingly, it is clear that Mother will not be in a position to provide Children with a safe and permanent home at any point in the foreseeable future. Therefore, we discern no abuse of discretion by the court in changing Children's permanent placement goals from reunification to adoption.

Accordingly, we affirm the decrees involuntarily terminating Mother's parental rights, and the orders changing Children's permanent placement goals to adoption.

Decrees affirmed. Orders affirmed.
Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 10/22/19